UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DONALD G. CARMAN,

        Plaintiff,

v.                                   Case No.  8:11-cv-639-T-24 MAP

ERIC K. SHINSEKI, Secretary,
Department of Veteran Affairs,

        Defendant.
_____/

**ORDER**

      This cause comes before the Court on Defendant's Motion for Summary Judgment.
(Doc. No. 44).  Plaintiff opposes the motion.  (Doc. No. 54).  As explained below, the motion is
granted in part.

**I.  Standard of Review**

      Summary judgment is appropriate "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). The Court must draw all inferences from the evidence in the light most favorable to the
non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d
1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of
showing the Court, by reference to materials on file, that there are no genuine issues of material
fact that should be decided at trial.  See id. (citation omitted).  When a moving party has
discharged its burden, the non-moving party must then go beyond the pleadings, and by its own
affidavits, or by depositions, answers to interrogatories, and admissions on file, designate
specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background

Plaintiff Donald Carman asserts disability discrimination, hostile work environment, and retaliation claims against Defendant regarding his employment as a fire inspector in the Safety Office at the James Haley VA Medical Center ("VA").  Plaintiff's job included inspecting the VA's 900 - 1,000 fire extinguishers every month and conducting fire drills.  (Doc. No. 54-2, ¶ 16; Doc. No. 44-2, p. 60).  The fire extinguisher inspections include examining each extinguisher, initialing the tag on the extinguisher, and recording the inspection in the inspection log in the Safety Office.

Plaintiff's supervisor was Debbie Ferekides, and she reported to Ronald Stipp until September of 2010.  In May of 2011, Jeff Karsonovich took over Stipp's position.

Plaintiff's disability involves a lumbar spine condition and cervical spine condition that limits his ability to sit, stand, and walk for long periods of time.  Plaintiff was supposed to have back surgery soon after he took the fire inspector position in June of 2007, but he put off the surgery until August 18, 2008.  (Doc. No. 54-1, p. 9, 11).

In his amended complaint, Plaintiff specifically identifies the following challenged employment actions as being discriminatory and retaliatory: (1) being given a five day suspension on March 17, 2009; (2) having his position downgraded from a GS-8 to a GS-7 in May of 2009; and (3) being given a five day suspension on August 11, 2010.  Additionally, he contends that he was subjected to a discriminatory and retaliatory hostile work environment.

### A.  Plaintiff's Back Surgery and Denial of Training

In mid-2008, an asbestos training course was announced.  Plaintiff asked James Watson (who was coordinating the asbestos training course) whether he was able to take the training

course.  (Doc. No. 54-1, p. 20-21).  Watson responded that he was told that if Plaintiff was having back surgery, then Plaintiff could not take the asbestos training course, but if Plaintiff did not have back surgery, then Plaintiff could take the asbestos training course.  (Doc. No. 54-1, p. 20-21).  Plaintiff does not know who instructed Watson that Plaintiff's attendance at the asbestos training course was contingent on whether Plaintiff had back surgery.  (Doc. No. 54-1, p. 61-62).  Plaintiff ended up having back surgery on August 18, 2008, and he did not take the asbestos training course.

In January of 2009, Plaintiff received an email regarding an intermediate safety training course in Nevada in February of 2009.  (Doc. No. 54-1, p. 19-20, 22).  Ferekides denied Plaintiff's request to attend the intermediate safety training course.   (Doc. No. 54-1, p. 22).  On January 16, 2009, Plaintiff filed an EEO charge of discrimination relating to the denial of his request to attend the intermediate safety training.[1]  (Doc. No. 44-8, p.2).

After Ferekides' denial, Plaintiff went to Stipp to ask for permission to attend the intermediate safety training course, and Stipp told Plaintiff that Plaintiff needed Ferekides' permission in order to attend.  (Doc. No. 54-1, p. 62).  Plaintiff called Ferekides, and she responded that Plaintiff could not take no for an answer, that she knew that he had filed a discrimination charge against her, and that the final answer on his training request was no.  (Doc. No. 54-1, p. 62-65).  Plaintiff, however, decided that he would take the course on his own and

---

[1]Ferekides' denial of Plaintiff's attendance at the intermediate safety training course is not an adverse employment action that provides a basis for Plaintiff's discrimination or retaliation claims, because he did not file this lawsuit within 90 days after receiving the EEOC's February 2010 final decision and notice of right to sue relating to the denial of this training.  (Doc. No. 46-3, p. 33).  However, the denial of training can be considered with respect to Plaintiff's hostile work environment claim.  Gowski v. Peake, 682 F.3d 1299, 1313 (11th Cir. 2012).

pay for it on his own, so he registered for it and took annual leave.  (Doc. No. 54-1, p. 22).

### B.  Five Day Suspension in March of 2009

In mid-2008, prior to Plaintiff having back surgery, he was accused of failing to inspect 45 fire extinguishers during the month of June of 2008, falsifying the inspection log, and failing to conduct eight fire drills from October of 2007 through July of 2008.  (Doc. No. 54-2, ¶ 7, 12; Doc. No. 45-1, ¶4).  Ferekides investigated those allegations in July and August of 2008.  (Doc. No. 54-2, ¶ 12).  However, prior to going out on leave for his back surgery on August 18, 2008, Plaintiff was not advised that any action would be taken against him.  (Doc. No. 54-2, ¶ 12).

Plaintiff was out of work due to his back surgery from August 18 through December 5, 2008.  (Doc. No. 54-1, p. 11).  During that time, the VA used subcontractors to do the monthly inspections of the VA's fire extinguishers.  (Doc. No. 44-5, p. 19).  Additionally, Plaintiff's co-workers within the Safety Office helped cover some of his duties.  (Doc. No. 44-1, ¶ 12).

Plaintiff returned to work on Monday, December 8, 2008, at which time he learned that he had use-or-lose leave available from December 10 through January 2, 2009.  (Doc. No. 54-1, p. 11).  He worked December 8th and 9th, and then he used his remaining leave through January 2, 2009. (Doc. No. 54-1, p. 11).

Plaintiff returned to work on January 5, 2009.  (Doc. No. 54-1, ¶ 11).  On January 8, 2009, Plaintiff received a proposed five day suspension, dated December 8, 2008, relating to the allegations that he had failed to inspect 45 fire extinguishers in June of 2008, falsified the inspection log, and failed to conduct eight fire drills.  (Doc. No. 45-3).  The proposed suspension was initiated by Ferekides and issued by Stipp.  Prior to issuing the proposed suspension, Stipp reviewed the evidence compiled by Ferekides relating to the allegations and made a

determination that the proposed suspension was warranted. (Doc. No. 45-2, ¶ 5).

One of the pieces of evidence that Stipp reviewed was a Report of Contact signed by Ferekides and dated May 16, 2008. (Doc. No. 46-1, p.54). In the Report of Contact, Ferekides stated that she gave Plaintiff a verbal counseling on May 16, 2008 regarding the required number of fire drills that had to be performed. (Doc. No. 46-1, p.54). Additionally, Ferekides stated in the Report of Contact that she gave Plaintiff a copy of his position description and told him that if he had any questions about it, to ask her by May 19, 2008. (Doc. No. 46-1, p.54). The Report of Contact ended with the statement that Plaintiff "did not discuss this matter with me since May 16th." (Doc. No. 46-1, p.54). However, because the Report of Contact was dated May 16th, and Ferekides stated therein that she had not discussed the matter of his position description with him since May 16th, Plaintiff contends that Ferekides fabricated the document, or at least back-dated it. Furthermore, Plaintiff contends that he never received the alleged verbal counseling on May 16, 2008. (Doc. No. 54-2, ¶ 13).

Plaintiff was given the opportunity to respond to Stipp regarding the allegations before Stipp made a final decision regarding the proposed suspension. Plaintiff submitted a written response to Stipp. (Doc. No. 45-2, ¶ 8). Plaintiff contends that he did not fail to inspect the 45 fire extinguishers and that he did not falsify the inspection log. (Doc. No. 54-2, ¶ 9, 16). Plaintiff appears to admit that the inspection log contains his writing, but he contends that the inspection log accurately reflects that he inspected all of the fire extinguishers. (Doc. No. 54-2, ¶ 8-9). Additionally, Plaintiff acknowledges that he did not conduct the eight fire drills, but he contends that the oversight was not intentional. (Doc. No. 54-2, ¶ 10).

On March 10, 2009, Stipp decided to sustain the proposed suspension. (Doc. No. 45-4).

Plaintiff was notified of the suspension on March 17, 2009 and was suspended without pay for five days—from March 23 - 27, 2009. (Doc. No. 45-4). Plaintiff contends that discipline for a first time failure to perform seldom results in a suspension. On August 31, 2009, Plaintiff filed an EEO charge of discrimination and retaliation regarding the suspension. (Doc. No. 46-1).

Plaintiff contends that other employees in the Safety Office who failed to complete monthly fire extinguisher inspections were not suspended. For example, when Plaintiff returned to work after having back surgery, he was put on light duty for a period of time and was only working four hours per day. As a result, Ferekides was using a subcontractor to do the fire extinguisher inspections, but the subcontractor was out of state for most of the month of April. (Doc. No. 54-2, ¶ 17). The subcontractor returned on April 28, 2009 and started doing fire extinguisher inspections at that time, but he could not get all of them done in April. (Doc. No. 54-2, ¶ 17). Therefore, the subcontractor wanted to treat all of the inspections that he did as inspections for the month of May. (Doc. No. 54-2, ¶ 17). Plaintiff told the subcontractor that such could not be done, but the subcontractor went to Ferekides and she authorized it. (Doc. No. 54-2, ¶ 17). Plaintiff told Stipp about this and that it meant that April's fire extinguisher inspections had not been done, yet Ferekides was not disciplined. (Doc. No. 54-2, ¶ 17). Furthermore, when asked at his deposition whether, in other instances where fire extinguishers had not been inspected in a given month, he recalled someone being suspended over it, Stipp answered no. (Doc. No. 44-5, p. 16-17).

Additionally, Plaintiff identifies Thomas Miller, who was hired in or after May of 2009 as  a fire inspector trainee, as another employee who failed to complete fire extinguisher inspections but was not suspended. (Doc. No. 54-2, ¶ 17). However, Plaintiff fails to provide

any further details in his statement of facts, such as when this occurred or how many fire

extinguishers Miller failed to inspect.

### C.  Position Downgrade from GS-8 to GS-7

Prior to Plaintiff being hired as a fire inspector in June of 2007, Ferekides submitted a

position description to Human Resources ("HR") for review, and she indicated that the position

should be graded as a GS-9.  (Doc. No. 54-9).  However, HR determined that the position should

be graded as a GS-8 in March of 2007.  (Doc. No. 54-10).

In May of 2009, Ferekides again submitted Plaintiff's position description to HR for

review and recommended that the position remain a GS-8 grade level.  (Doc. No. 45-1, ¶ 18;

Doc. No. 45-1, p. 24).  Defendant sent the position description to Mr. Knutson, a classifier up

north that was contracted to evaluate position descriptions.  (Doc. No. 44-9, p. 8).  Knutson

reviewed the position description and recommended a GS-7 grade.  (Doc. No. 44-9, p. 8-9).

Thereafter, Defendant's classifier, Adam Garcia, reviewed Knutson's recommendation and

signed off on the downgrade.  (Doc. No. 44-9, p. 9).  The downgrade occurred despite the fact

that there had been no change in Plaintiff's duties. (Doc. No. 54-2, ¶ 19).  Neither Ferekides nor

Stipp was involved in the decision to downgrade Plaintiff's position.  (Doc. No. 44-5, p. 28-29;

Doc. No. 54-22, p. 17-19; Doc. No. 45-1, ¶ 18; Doc. No. 44-9, p. 8-9).

Plaintiff, however, was able to retain his GS-8 pay grade for two years, and thereafter, he

is entitled to pay retention, which means that he stays at his same salary even though his grade

has become a GS-7.  (Doc. No. 44-9, p. 9-10).  The downsides to this are: (1) he would only get

50% of cost-of-living increases if/when they are given again; (2) he would not receive the higher

step increases at a GS-8 level; and (3) his ability to advance to higher GS levels from a higher

GS level is impaired.  (Doc. No. 44-9, p. 10; Doc. No. 54-2, ¶ 24).

After the downgrade, the VA hired Thomas Miller as a fire inspector trainee, and Miller's position was graded as a GS-5.  (Doc. No. 54-2).  Plaintiff believes that his position was downgraded, in part, due to the decision to hire Miller as a fire inspector trainee.  (Doc. No. 54-2, ¶ 23; Doc. No. 44-2, p. 76).  Specifically, Miller was graded a GS-5, and a training position could not be graded more than two levels below the position to which the training position relates.  (Doc. No. 44-9, p. 16; Doc. No. 44-2, p. 76).  Therefore, because Miller was graded as a GS-5, Plaintiff believes that he was downgraded to a GS-7 grade.  (Doc. No. 44-2, p. 76).

Plaintiff also believes that his position was downgraded as a result of disability discrimination and retaliation.  On August 31, 2009, Plaintiff filed an EEO charge of discrimination and retaliation regarding the downgrade.  (Doc. No. 46-1).  In support of his contention that his downgrade was due to discrimination and retaliation, Plaintiff points out that in 2009, another employee, Danny Campbell, filed an EEO charge of discrimination and thereafter was downgraded from a GS-6 to a GS-5.  (Doc. No. 54-23).  Furthermore, Plaintiff contends that Neal Hamilton and Adam Garcia from HR were both involved in both Plaintiff and Campbell's downgrade decisions.  (Doc. No. 54-23).

**D.  Five Day Suspension in August of 2010**

Plaintiff was not available to conduct the inspections of the fire extinguishers for most of December of 2009.  (Doc. No. 44-1, p. 101).   He took annual leave in the beginning of December, and from December 14 through 18, 2009, he was at a training course.  (Doc. No. 44-1, p. 98-99).   Plaintiff was also supposed to take annual leave from December 21 - 31, 2009.  (Doc. No. 44-1, p. 98).  In order to attempt to inspect all of the fire extinguishers during the

month of December, Plaintiff decided to come to work on December 28th, 29th, and 30th instead of taking annual leave on those days.  (Doc. No. 44-1, p. 100).  However, Plaintiff was unable to inspect 20 fire extinguishers, and he emailed Ferekides at 3:35 p.m. on December 30, 2009 to let her know.  (Doc. No. 44-1, p. 100-01).

Because Plaintiff had failed to inspect all of the fire extinguishers for the month of December, Plaintiff received a proposed five day suspension, dated March 4, 2010.  (Doc. No. 47, p. 4-6).  The proposed suspension was initiated by Ferekides and issued by Stipp.  Prior to issuing the proposed suspension, Stipp reviewed the evidence compiled by Ferekides relating to the allegations and made a determination that the proposed suspension was warranted.  (Doc. No. 45-2, ¶ 11).

Plaintiff was given the opportunity to respond to Stipp regarding the allegations before Stipp made a final decision regarding the proposed suspension.  Plaintiff submitted a written response to the proposed suspension, and he also met with Stipp to discuss it.  (Doc. No. 45-2, ¶ 12; Doc. No. 47, Ex. 7).  Plaintiff had shoulder surgery in April of 2010 and was out on sick leave for three months.  (Doc. No. 44-1, p. 40).  On August 5, 2010, Stipp decided to sustain the proposed suspension, and Plaintiff was notified of the suspension on August 11, 2010.  (Doc. No. 47, p. 60).  As a result, Plaintiff was suspended without pay for five days—from September 13 - 17, 2010.  (Doc. No. 47, p. 66).  Thereafter, Plaintiff filed an EEO charge of discrimination and retaliation regarding the suspension.  (Doc. No. 44-1, p. 97).

**E.  Hostile Work Environment**

Additionally, Plaintiff contends that he was subjected to a discriminatory and retaliatory hostile work environment. Plaintiff filed EEO charges regarding the hostile work environment on

March 28, 2011 and December 6, 2011.  (Doc. No. 46-1, p. 18, 44).  Within those EEO charges,

Plaintiff identifies various incidents, which are described below.[2]

### 1.  March 30, 2011 Incident

On March 30, 2011, Ferekides asked Plaintiff to come into her office to discuss a work

issue.  (Doc. No. 54-2, ¶ 30).  Plaintiff was entitled to have a union representative present

whenever a written or verbal counseling about work was discussed, so Plaintiff asked that a

union representative be present.  (Doc. No. 54-2, ¶ 30).  Ferekides denied Plaintiff's request that

a union representative be present and began reprimanding Plaintiff.  (Doc. No. 54-2, ¶ 30).

Plaintiff told Ferekides that he would leave her office if he could not have a union representative

present, and Ferekides again denied his request.  (Doc. No. 54-2, ¶ 30).  Plaintiff began to leave

Ferekides' office, and she physically blocked Plaintiff's exit and raised her voice.  (Doc. No. 54-

2, ¶ 30).

In response, Plaintiff went over to the phone on Ferekides' desk and called the VA

police.  (Doc. No. 54-2, ¶ 30).  Ferekides repeatedly told Plaintiff to hang up the phone, but he

did not hang up.  (Doc. No. 54-2, ¶ 30).  Ferekides then pressed the panic button in her office.

(Doc. No. 44-3, p. 25).  Thereafter, another employee walked into Ferekides' office, and Plaintiff

was able to exit Ferekides' office.  (Doc. No. 44-2, p, 93).  When the VA police arrived,

Plaintiff spoke with an officer and broke down crying about the incident.  (Doc. No. 44-2, p. 93;

Doc. No. 54-14).  Thereafter, Plaintiff filed a workers' compensation claim due to the effect this

incident has had on him (i.e., it has caused depression and anxiety).  (Doc. No. 54-17).

---

[2]The parties did not do a good job explaining the various incidents that make up
Plaintiff's hostile work environment claim.  The Court searched through the record to get an
understanding of the context for Plaintiff's vague and conclusory allegations regarding the
conduct that supports his hostile work environment claim.

## 2.  Leave Status and Letters After the March 30, 2011 Incident

Defendant opposed Plaintiff's workers' compensation claim, but on June 8, 2012, the

Office of Workers' Comp Programs ("OWCP") approved his claim.  (Doc. No. 54-17; Doc. No.

54-2, ¶ 32).  Plaintiff has not returned to work since the March 30, 2011 incident.  (Doc. No. 54-

2, ¶ 33).

Plaintiff was not paid for a 15-month period after the March 30th incident until OWCP

approved his workers' compensation claim.  (Doc. No. 54-2, ¶ 33).  Furthermore, Defendant has

still not paid Plaintiff for the first 45 days after the incident when he was out on workers'

compensation leave ("OWCP leave").  (Doc. No. 54-2, ¶ 33).  Additionally, Plaintiff believes

that Jeff Karsonovich (who had taken over Stipp's position) incorrectly charged Plaintiff's

annual leave, sick leave, and FMLA leave while Plaintiff has been out on OWCP leave.  (Doc.

No. 54-2, ¶ 33).

On May 14, 2011, Plaintiff learned that Defendant did not send OWCP the supporting

documentation he had attached to his workers' compensation claim.  (Doc. No. 54-2, ¶ 34).  On

June 13, 2011, Karsonovich wrote to Plaintiff to inform him that his failure to return to work was

being characterized as absence without leave ("AWOL"), unless Plaintiff requested leave

without pay ("LWOP") and submitted copies of the same medical documentation that Plaintiff

had already sent to Defendant's HR/OWCP coordinator.  (Doc. No. 54-2, ¶ 35; Doc. No. 46-3, p.

48).     On June 21, 2011, Karsonovich again wrote to Plaintiff.  In his letter, Karsonovich stated

that he had inadvertently charged Plaintiff's leave as annual/sick leave, and if Plaintiff wanted it

characterized as LWOP, Plaintiff needed to submit such a request.  (Doc. No. 46-3, p. 49).

Karsonovich further stated that until Plaintiff submitted a request for LWOP and supporting

medical documentation, he would be characterized as being AWOL.  (Doc. No. 46-3, p. 50).

Additionally, Karsonovich stated that it might become necessary to reassign him to another

position during his absence.  (Doc. No. 54-2, ¶ 36; Doc. No. 46-3, p. 50).

Plaintiff invoked FMLA leave from June 30, 2011 through September 26, 2011.  On

September 9, 2011, Karsonovich sent Plaintiff a Return to Duty letter, in which he stated that

Plaintiff was expected to return to work on September 27, 2011, unless he requested additional

leave and submitted medical documentation.  (Doc. No. 46-3, p. 62).  Karsonovich warned

Plaintiff that if he did not return to work and did not submit the requisite leave request with

medical documentation, he could be characterized as AWOL and that such could be used as the

basis for disciplinary action, including removal from federal service.  (Doc. No. 54-2, ¶ 36; Doc.

No. 46-3, p. 62).

On October 13, 2011, Karsonovich sent Plaintiff a second Return to Duty letter

demanding medical documentation due to his continued absence from work.  (Doc. No. 46-3, p.

63).  Karsonovich advised Plaintiff that as of September 27, 2011, he was being characterized as

being AWOL and that such could be used as a basis for disciplinary action, including removal

from federal service.  (Doc. No. 54-2, ¶ 36; Doc. No. 46-3, p. 63).

On February 17, 2012, Plaintiff received a response to his request for LWOP through

June 1, 2012, in which Karsonovich indicated that he did not concur with Plaintiff's request.

(Doc. No. 54-2, ¶ 37).  On February 24, 2012, Karsonovich sent Plaintiff a Return to Duty letter

stating that Plaintiff's LWOP approval would expire on March 1, 2012.  (Doc. No. 46-3, p. 65).

Additionally, Karsonovich stated that Plaintiff was expected to return to work on March 2, 2012,

unless he submitted medical documentation to support his continued absence.  (Doc. No. 46-3, p.

65).  Karsonovich stated that if Plaintiff did not return to work and did not submit medical

documentation to support his continued absence, he would be characterized as being AWOL and

could be terminated.  (Doc. No. 54-2, ¶ 37; Doc. No. 46-3, p. 65).  Plaintiff requested and was

approved for LWOP status for the period of March 2, 2012 through September 2, 2012.  (Doc.

No. 54-18, p. 2).

Plaintiff contends that Karsonovich's letters were improper, because Section 10 of the

Master Agreement between the VA and the American Federation of Government Employees

states that "LWOP is granted at the discretion of the Department, except . . . [w]hen requested by

an employee who has suffered an incapacitating job-related injury or illness and is waiting

adjudication of a claim for employee compensation by the OWCP."  (Doc. No. 54-25, p. 10).

Thus, Plaintiff contends that requiring Plaintiff to submit his medical records to HR, threatening

to characterize him as AWOL, and threatening possible termination was improper, because he

was entitled to have LWOP status while his workers' compensation claim was awaiting

adjudication.

### 3.  Conversations About Plaintiff

Plaintiff submits the EEOC statement of Barbara Sittnick, Plaintiff's co-worker in the

Safety Office, in which Sittnick states that she had overheard discussions in the Safety Office

between Ferekides and Sittnick's other co-workers that Plaintiff had filed an EEO complaint, and

Ferekides told Sittnick to be careful.  (Doc. No. 44-11, p. 4, 6).  Sittnick also states that she

overheard conversations in the Safety Office about having to cover for Plaintiff while he was out

and questioning whether Plaintiff would come back to work after his back surgery.  (Doc. No.

44-11, p. 5).  Based on the negative conversations that she overheard, Sittnick concluded that the

Safety Office staff did not like Plaintiff.  (Doc. No. 44-11, p. 5).  As a result, on March 13, 2009, Sittnick spoke with Ferekides and told her that she did not want to be included in the negative conversations about Plaintiff.  (Doc. No. 44-11).  Plaintiff, however, admits that Sittnick did not relay to Plaintiff any of the specific comments that were made about him.  (Doc. No. 44-1, p. 77-78, 83).  Furthermore, Plaintiff admits that there was never any office talk while he was present about his back condition or any limitations his condition might present.  (Doc. No. 44-1, p. 82).

Additionally, on May 28, 2009, Plaintiff observed Ferekides and other co-workers laughing and making fun of him when he requested additional training.  (Doc. No. 54-2, ¶25).  Plaintiff believes that Ferekides routinely defamed Plaintiff whenever the opportunity arose (however, he has not specifically identified anything that Ferekides has allegedly said).  (Doc. No. 54-2, ¶ 34).

### 4.  Ferekides' Treatment of Plaintiff after He Returned from Surgery

Plaintiff contends that in January 2009, after he returned from back surgery, Ferekides removed him from several group activities and cancelled his membership in other hospital committees.  (Doc. No. 54-2, ¶ 15).  Plaintiff does not give any further detail regarding this allegation, such as identifying any of the groups or committees.

Additionally, Plaintiff contends that from January 2009 through June 2010, Ferekides spent no time with him updating him on any changes adopted during his extended sick leave absence.  (Doc. No. 54-2, ¶ 15).  Again, Plaintiff does not give any further detail regarding this allegation; he does not identify any changes that were not brought to his attention or explain how this affected him or his job performance.

14

**5.  Performance Evaluation**

Plaintiff contends that in February 2009, he received Ferekides' performance evaluation that she created without performing the required periodic progress review with him, and Ferekides back-dated her signature to 2008.  (Doc. No. 54-2, ¶ 15).  Plaintiff does not give any further detail regarding this allegation, including how this performance evaluation affected him or his job performance.

**6.  May 16, 2008 Report of Contact**

Plaintiff contends that Ferekides fabricated a written report of contact dated May 16, 2008 regarding an alleged verbal counseling about the required number of fire drills that had to be performed.  (Doc. No. 54-2, ¶ 15; Doc. No. 46-1, p.54).  Ferekides stated in the Report of Contact that she gave Plaintiff a copy of his position description and told him that if he had any questions about it, to ask her by May 19, 2008.  (Doc. No. 46-1, p.54).  The Report of Contact ended with the statement that Plaintiff "did not discuss this matter with me since May 16th." (Doc. No. 46-1, p.54).  However, because the Report of Contact was dated May 16th, and Ferekides stated therein that she had not discussed the matter of his position description with him since May 16th, Plaintiff contends that Ferekides fabricated the document, or at least back-dated it.  Furthermore, Plaintiff contends that he never received the alleged verbal counseling on May 16, 2008.  (Doc. No. 54-2, ¶ 13, 15).

**7.  Unsafe Work Environment**

Plaintiff contends that on November 20, 2009, Ferekides subjected him to an unsafe work environment by placing a 4x8 foot banner on the floor at the entrance of his office.  (Doc. No. 54-2, ¶ 26).  The banner was hung for fire prevention week, but it was not taken down in a

timely manner.  (Doc. No. 54-19, p. 82).  As a result, someone removed the banner and brought it to Ferekides.  (Doc. No. 54-19, p. 82-83).  Ferekides put the banner along the wall in Plaintiff and Miller's office so they would see the banner and put it away.  (Doc. No. 54-19, p. 83).

### 8.  Allegations Against Plaintiff

Plaintiff contends that in February of 2010, Ferekides did not support him when he received two complaints regarding fire drill training with the OR staff.  (Doc. No. 54-2, ¶ 27). Specifically, the chief of anesthesiology complained that the fire drill training did not meet his expectations and that Plaintiff was late.  (Doc. No. 44-4, p. 79).  Ferekides responded to the chief that she would look into his complaints.  (Doc. No. 44-4, p. 79).  While Ferekides did not specifically respond to the chief to support Plaintiff, Ferekides instead spoke with others about the matter and resolved the issue.  (Doc. No. 44-4, p. 80-82).

Additionally, Plaintiff contends that in October of 2010, Ferekides requested a fact-finding meeting with him regarding two incidents where he allegedly failed to follow established procedures.  The first incident related to Plaintiff taking sick leave for a surgery and allegedly not filling out the proper paperwork in order to take the leave.  (Doc. No. 44-4, p. 92-96).  The second incident involved Plaintiff's alleged failure to inspect the microwaves in the VA, which Ferekides ultimately concluded was the result of a mis-communication.  (Doc. No. 44-4, p. 97-98).  Plaintiff does not explain why Ferekides' investigations into these matters was harassing or hostile.

Additionally, on January 25, 2011, Ferekides told him that there had been some oversights in assignments not completed and that he needed to repeat the survey inspection of the SCI garage by March 2011.  (Doc. No. 54-2, ¶ 29).  However, Ferekides determined that

there had been a mis-communication regarding who was responsible for the inspection of the SCI garage, and ultimately, Plaintiff did not have to redo the inspection.  (Doc. No. 44-4, p. 108-10).

### 9.  Denial of Requests to Take Care of Personal Matters on Work Time

Plaintiff contends that on August 20, 2010, Ferekides denied his request for authorized time to go to the Union to discuss the suspension he received.  Ferekides denied Plaintiff's request because Plaintiff had already been given eight hours of authorized time to speak with the Union after he was given the proposed suspension, and after the suspension was final, he was not entitled to additional time during working hours to speak with the Union.  (Doc. No. 44-4, p. 84-85).

Additionally, Plaintiff contends that on December 10, 2010, Ferekides would not allow him to take 30 minutes during working hours to finish his physical therapy session, despite the fact that she had allowed two other employees to do yoga and walking during business hours. (Doc. No. 54-2, ¶ 29).

### 10.  Reasonable Accommodations

Plaintiff contends that he requested two reasonable accommodations: (1) a compressed work schedule, and (2) a golf cart to use when checking fire extinguishers.  Plaintiff contends that Ferekides denied both requests.

In 2007, Plaintiff requested a 5-4-9 compressed work schedule, wherein he would have every other Friday off from work.  (Doc. No. 44-1, p. 21; Doc. No. 46-1, p. 10).  This compressed work schedule would allow him to avoid taking sick leave on the Fridays that he was off so he could go to doctors' appointments on those days.  (Doc. No. 44-1, p. 21-22; Doc.

No. 46-1, p. 10).  Ferekides denied Plaintiff's request, because she needed him at work everyday

and stated that he could use FMLA leave when he needed to go to a doctor's appointment.  (Doc.

No. 44-4, p. 56-59).  Plaintiff concedes that Ferekides always approved his sick leave requests at

that time and did not give him any problems regarding his sick leave requests.  (Doc. No. 44-1,

p. 46-47, 50).

Additionally, Plaintiff contends that on September 8, 2010, Ferekides failed to provide

him another reasonable accommodation he requested, a golf cart, until he provided actual

medical documentation from his physician.  Plaintiff contends that he requested a golf cart to use

when checking the fire extinguishers, because he was having problems with prolonged walking

and standing.  (Doc. No. 44-1, p.24).  Ferekides responded that he needed to provide medical

documentation before his request would be considered.  (Doc. No. 44-1, p. 25).  Plaintiff decided

not to pursue the matter further and did not provide any medical documentation to Ferekides to

support the request.  (Doc. No. 44-1, p. 25, 28).

### 11.  Documentation in the Fire System Impairment Log

Plaintiff contends that on September 1, 2010, and contrary to past practice, Ferekides

instructed him to stop documenting the Fire System Impairment Log in the network drive.  (Doc.

No. 54-2, ¶ 29).  Plaintiff does not explain how this was a harassing or hostile act.

### 12.  Leave Requests

Plaintiff contends that Ferekides has stopped approving leave in advance and instead

approves it or disapproves it within three days of the requested leave date.  (Doc. No. 54-2, ¶

29).  Furthermore, Plaintiff contends that from April of  2010 to August 2010, Ferekides

frequently questioned and harassed him regarding his attempts to enter leave requests.  For both

of these allegations, Plaintiff does not specify what type of leave he is referring to (i.e., annual

leave, sick leave, FMLA leave, etc) and whether his leave requests were ever denied.

### 13.  Drug Test

Plaintiff contends that on January 19, 2011, he was singled out and subjected to a

purportedly "random" drug test.  (Doc. No. 54-2).  However, the evidence before the Court

shows that someone in Washington determines who is randomly drug tested, and as such, it

cannot be attributed to someone at the VA in Tampa.  (Doc. No. 44-4, p. 106-08).

### 14.  Denial of Training Requests

Plaintiff does not address this allegation in his statement of facts, but he does make the

conclusory allegation in his amended complaint that "[s]ince September 29, 2009, Ferekides has

denied all training requests" that he has submitted.  (Doc. No. 16, ¶ 15).  Plaintiff does not

identify the trainings that Plaintiff requested in his amended complaint or statement of facts, but

he identifies several trainings in his EEO charge.  (Doc. No. 46-1, 9. 20-21).  In his EEO charge,

Plaintiff states: (1) on October 8, 2009, he was denied OSHA training; (2) on October 7, 2010,

he was denied VA EES VISN training; (3) on February 10, 2010, his request for VA Basic

GEMS training was ignored; (4) on September 29, 2009, October 7, 2009, and December 9,

2010, his request for OSHA training was ignored; (5) on December 29, 2010, his request for

OSHA training was ignored; (6) on January 5, 2011 and January 11, 2011, his requests for

OSHA training were denied; and (7) on February 22, 2011, his request to attend an NFPA

training was ignored.  (Doc. No. 46-1, 9. 20-21).

### 15.  Denial of Ability to Obtain Overtime for Evening Fire Drills

Prior to Miller, the fire inspector trainee, being hired, Plaintiff conducted all of the fire

drills.  (Doc. No. 44-1, p. 57, 63).  After Miller was hired, Plaintiff did the morning fire drills, and Miller was supposed to do the evening fire drills.  (Doc. No. 44-1, p. 57).  Plaintiff was able to get an hour of overtime for doing the 6:00 a.m. fire drills, since his workday started at 7:00 a.m and ended at 3:30 p.m.  (Doc. No. 44-1, p. 60).  Miller, whose workday went from 8:30 a.m. to 5:00 p.m. was given the evening fire drills.  (Doc. No. 44-1, p. 57, 60).  Plaintiff wanted the ability to do the 5:00 p.m. fire drills, because those would generate two overtime hours for him, given that his workday ended at 3:30.  (Doc. No. 44-1, p. 57-58, 60).  Ferekides denied Plaintiff's request to do the evening fire drills, because Miller could do the evening fire drills during his shift and would not require overtime.  (Doc. No. 44-1, p. 60-61, 64).

### F.  Amended Complaint

In his amended complaint, Plaintiff asserts four claims: Count I is a retaliation claim under the Rehabilitation Act; Count II is a disability discrimination claim under the Rehabilitation Act; Count III is a discriminatory and retaliatory hostile work environment claim; and Count IV is a request for injunctive relief under the Rehabilitation Act.  (Doc. No. 16).

### III.  Motion for Summary Judgment

Defendant moves for summary judgment on all of Plaintiff's claims.  Accordingly, the Court will analyze each claim.  First, the Court will analyze whether Defendant is entitled to summary judgment on Plaintiff's retaliation and disability discrimination claims under the Rehabilitation Act with respect to the three discrete adverse employment actions.  Thereafter, the Court will address Plaintiff's hostile work environment claim.

**A.  Retaliation and Discrimination Claims**[3]

In the absence of direct evidence of discrimination or retaliation, the McDonnell Douglas

burden-shifting analysis applies to claims made under the Rehabilitation Act.[4]  See Webb v.

Donley, 347 Fed. Appx. 443, 445 (11th Cir. 2009).  In order to establish a prima facie case of

disability discrimination under the Rehabilitation Act, Plaintiff "must show that: (1) he has a

disability; (2) he is otherwise qualified for the position; and (3) he was subjected to unlawful

discrimination as the result of his disability."  Sutton v. Lader, 185 F.3d 1203, 1207 (11th Cir.

1999).  In order to establish a prima facie case of retaliation under the Rehabilitation Act,

Plaintiff must show: "(1) he engaged in statutorily protected expression; (2) he suffered a

---

[3]The Court applies "the same standards under the Rehabilitation Act, the ADA, and Title
VII and uses the same framework to analyze these claims."  Tarmas v. Secretary of Navy, 433
Fed. Appx. 754, 761 n.7 (11th Cir. 2011).

[4]Plaintiff makes the conclusory allegation that he has presented direct evidence of
discrimination and retaliation.  (Doc. No. 54, p. 19).  However, Plaintiff fails to specify what
direct evidence he has other than Ferekides' alleged warning to Sittnick that Plaintiff had filed an
EEO charge and to be careful.  That, however, is not direct evidence of discrimination or
retaliation.  See Ekokotu v. Boyle, 294 Fed. Appx. 523, 526 (11th Cir. 2008)(finding that the
statement by a supervisor that she would get the complainant back for filing an internal
complaint against her was not direct evidence of discrimination or retaliation).
        Plaintiff appears to misunderstand the definition of direct evidence.  As explained by the
court in Addison v. Ingles Markets, Inc.:
        Direct evidence of discrimination [or  retaliation] is evidence that, if
        believed, proves the existence of a fact without inference or presumption.
        [O]nly the most blatant remarks, whose intent could mean nothing other than
        to discriminate on the basis of some impermissible factor [or to retaliate]
        constitute direct evidence of discrimination.  Accordingly, remarks by non-
        decisionmakers or remarks unrelated to the decisionmaking process itself are
        not direct evidence of discrimination.   The evidence must reflect a
        discriminatory or retaliatory attitude correlating to the discrimination or
        retaliation complained of by the employee.
Addison v. Ingles Markets, Inc., 2013 WL 1395732, at *1 (11th Cir. Apr. 5, 2013)(internal quotation
marks and citations omitted).  "Evidence that is subject to more than one interpretation is not direct
evidence."  Ekokotu, 294 Fed. Appx. at 525.

materially adverse action; and (3) there was some causal relationship between the two events."

Simpson v. State of Alabama Dept. of Human Resources, 2012 WL 6621400, at *1 (11th Cir.

Dec. 18, 2012).

For both discrimination and retaliation claims, if Plaintiff establishes a prima facie case,

the burden shifts to Defendant to proffer a legitimate, non-discriminatory reason for the

employment action.  See Webb, 347 Fed. Appx. at 445.  If Defendant proffers a legitimate, non-

discriminatory reason, the burden shifts back to Plaintiff to show that the proffered reason is

pretext for discrimination or retaliation.  See id.  When analyzing whether Plaintiff has shown

pretext, the Court is mindful of the following:

> In order to show pretext, the plaintiff must demonstrate that the
> proffered reason was not the true reason for the employment decision
> . . . . [The plaintiff] may succeed in this either directly by persuading
> the court that a discriminatory reason more likely motivated the
> employer or indirectly by showing that the employer's proffered
> explanation is unworthy of credence.  [A] plaintiff withstands
> summary adjudication by producing sufficient evidence to allow a
> reasonable finder of fact to conclude that the defendant's articulated
> reasons for its decision are not believable.  In evaluating a summary
> judgment motion, [t]he district court must evaluate whether the
> plaintiff has demonstrated such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the employer's
> proffered legitimate reasons for its action that a reasonable factfinder
> could find them unworthy of credence.

Jackson v. State of Alabama State Tenure Com'n, 405 F.3d 1276, 1289 (11th Cir. 2005)(internal

quotation marks and citations omitted).

With this burden-shifting framework in mind, the Court addresses the three discrete

challenged employment actions.  The Court notes that for the purposes of this Order, the Court

assumes that Ferekides and Stipp were aware of all of Plaintiff's EEO activity at the time he filed

each charge.

## 1.  Five Day Suspension in March of 2009

Plaintiff received a five day suspension in March of 2009, and he contends that he was suspended for discriminatory and retaliatory reasons.  Defendant moves for summary judgment on Plaintiff's discrimination and retaliation claims based on this adverse employment action, arguing that: (1) the retaliation claim fails because the proposed suspension was issued prior to Plaintiff's EEO activity; and (2) the discrimination and retaliation claims fail, because Defendant had a legitimate, non-discriminatory reason for the suspension.

### a.  Timing of Suspension

Defendant moves for summary judgment on Plaintiff's retaliation claim based on this suspension, because the proposed suspension was issued prior to Plaintiff's January 16, 2009 EEO activity.  On January 8, 2009, Plaintiff received the proposed five day suspension, which was dated December 8, 2008; thus, the proposed suspension was issued prior to Plaintiff's EEO activity and could not have been issued in retaliation for EEO activity that had not yet occurred.

Plaintiff responds that Stipp issued the final suspension in March of 2009, after Plaintiff's EEO activity occurred.  Thus, Plaintiff contends that there is a causal connection between his January 16, 2009 EEO charge and Stipp's March 2009 decision to issue the final suspension.  Given the temporal proximity of these events, the Court rejects Defendant's argument that summary judgment must be granted due to a lack of a casual connection.  See Belyea v. Fla., Department of Revenue, 859 F. Supp.2d 1272, 1274 (N.D. Fla. 2012).

### b.  Legitimate, Non-Discriminatory Reason for the Suspension

Next, Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination and retaliation claims based on this suspension, because Defendant had a

legitimate, non-discriminatory reason for the suspension.  Specifically, Defendant argues that

Stipp concluded that Plaintiff had failed to inspect 45 fire extinguishers in June of 2008, falsified

the inspection log, and failed to conduct eight fire drills in October of 2007 through July of 2008.

In response, Plaintiff argues that the proffered reason is pretextual, because: (1) he did

inspect all of the fire extinguishers; (2) if he was unable to inspect all of the extinguishers, there

would be no reason to falsify the inspection log to cover it up, because he could have asked for

help completing the inspections; (3) if he was going to falsify records, he would have initialed

the tags on the fire extinguishers; and (4) others in the Safety Office did not get suspended when

they failed to inspect some fire extinguishers.

The Court notes the following when evaluating Plaintiff's argument of pretext:

> [F]or purposes of summary judgment, an employer's assertion that an
> employee was [reprimanded] for violating a work rule is arguably
> pretextual when a plaintiff submits evidence (1) that she did not
> violate the cited work rule, or (2) that if she did violate the rule, other
> employees outside the protected class, who engaged in similar acts,
> were not similarly treated. With respect to the former method for
> proving pretext, the ultimate issue is whether the decisionmaker
> believed that the employee violated the rule, not whether the
> employee actually violated the rule.  With respect to the latter
> method, the quantity and quality of the comparator's misconduct must
> be "nearly identical" to the plaintiff's.   Employees who have
> committed multiple policy violations are not similarly situated to
> employees who committed only one such violation

Bush v. Houston County Com'n, 414 Fed. Appx. 264, 267 (11th Cir. 2011)(quotation marks and

internal citations omitted).  As explained below, Plaintiff has not shown that Defendant's

proffered reason is pretextual.

First, Plaintiff argues that he did, in fact, inspect all of the fire extinguishers.  The flaw in

this argument, however, is that the relevant inquiry is not whether Plaintiff inspected all of the

extinguishers; instead, the relevant inquiry is whether Stipp reasonably believed that Plaintiff did not inspect the extinguishers.  See id.  The evidence file that Stipp considered contains pictures of the extinguisher tags reflecting that the tags were not initialed as being inspected in June.[5] (Doc. No. 45-3; Doc. No. 45-4).  Therefore, Stipp had a basis for coming to the conclusion that Plaintiff did not inspect the extinguishers.

Second, Plaintiff argues that if he was unable to inspect all of the extinguishers, there would be no reason to falsify the logs to cover it up, because he could have asked for help completing the inspections.  However, Plaintiff is simply challenging Stipp's conclusion that Plaintiff failed to inspect the extinguishers.  Given that the extinguisher tags do not contain Plaintiff's initials for June, and given that Plaintiff acknowledges that the writing on the inspection log was his own, there was a basis for Stipp to conclude that Plaintiff did not inspect the extinguishers and that Plaintiff falsified the inspection log to cover it up.  Furthermore, Plaintiff has admitted that he did not conduct the eight fire drills.

Third, Plaintiff argues that if he was going to falsify records, he would have initialed the tags on the fire extinguishers.  Like Plaintiff's second argument, Plaintiff is simply challenging Stipp's conclusion that Plaintiff failed to inspect the extinguishers and falsified the inspection log.  As stated above, there was a basis for Stipp to conclude that Plaintiff did not inspect the extinguishers and that Plaintiff falsified the inspection log to cover it up.

Fourth, Plaintiff argues that others in the Safety Office did not get suspended when they failed to inspect some fire extinguishers.  In support of this argument, Plaintiff identifies

---

[5]Two of the pages of the record file purportedly containing copies of two extinguisher tags are unreadable (Doc. No. 45-3, p. 25-26), but the remaining pages reflect 43 extinguisher tags that were not initialed for June.

Ferekides and Miller as two people who did not get suspended.  However, based on the record before the Court, Ferekides and Miller are not sufficient comparators.

With regard to Ferekides, Plaintiff points out that Ferekides was using a subcontractor to do the fire extinguisher inspections when Plaintiff returned from back surgery and was put on light duty. The subcontractor was out of state for most of the month of April 2009.  The subcontractor returned on April 28, 2009 and started doing fire extinguisher inspections at that time, but he could not get all of them done in April.  Therefore, the subcontractor wanted to treat all of the inspections that he did as inspections for the month of May.  Plaintiff told the subcontractor that such could not be done, but the subcontractor went to Ferekides and she authorized it.  Plaintiff told Stipp about this and that it meant that April's fire extinguisher inspections had not been done, yet Ferekides was not disciplined.

Ferekides is Plaintiff's supervisor, and there is no evidence in the record that her duties included fire extinguisher inspections.  While Ferekides was in charge of the Safety Office, her position is not the same as Plaintiff's position, which did include the duty of fire extinguisher inspections.  Thus, Ferekides is not a proper comparator, as Plaintiff has not shown that she was similarly situated to him.

Furthermore, Plaintiff was suspended not only for failing to inspect fire extinguishers, but also for falsifying the inspection log and failing to conduct eight fire drills.  There is no evidence that Ferekides also was accused of falsifying the inspection log and failing to conduct eight fire drills, and as such, she is not a proper comparator, because she was not accused of committing the same violations as Plaintiff.

With regard to Miller, the fire inspector trainee, as a comparator, Plaintiff makes the

conclusory allegation that Miller failed to complete fire extinguisher inspections but was not suspended.  However, Plaintiff fails to provide any further details in his statement of facts, such as when this occurred or how many fire extinguishers Miller failed to inspect.  Given this lack of necessary information, the Court cannot conclude that Miller is a proper comparator.  See Bush, 414 Fed. Appx. at 268.  Furthermore, there is no evidence that Miller was also accused of falsifying the inspection log and failing to conduct eight fire drills, and as such, Miller is not a proper comparator, because Plaintiff has not shown that Miller was accused of committing the same violations as Plaintiff.

Finally, Plaintiff points out that in Stipp's deposition testimony, Stipp was asked whether, in other instances where fire extinguishers had not been inspected in a given month, Stipp recalled someone being suspended over it, and Stipp answered no.  Again, without more information about the circumstances surrounding other failures to inspect fire extinguishers, this statement by Stipp cannot be used as a basis to find that Defendant's legitimate, non-discriminatory reason for Plaintiff's suspension is pretextual.

Accordingly, the Court concludes that Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's suspension, and Plaintiff has not shown evidence of pretext. As such, the Court grants Defendant's motion for summary judgment on Plaintiff's retaliation and discrimination claims to the extent those claims are based on Plaintiff's March 2009 suspension.

## 2.  Position Downgrade from GS-8 to GS-7

In May of 2009, Plaintiff's position was downgraded from a GS-8 to a GS-7.  Plaintiff contends that the downgrade was motivated, in part, by discriminatory and retaliatory reasons.

Defendant moves for summary judgment on Plaintiff's discrimination and retaliation claims based on this adverse employment action, arguing that the decision-makers involved in the decision did not have any discriminatory or retaliatory animus towards Plaintiff.

Specifically, Defendant provides evidence that position descriptions are supposed to be reviewed every two years. (Doc. No. 44-9, p.11-12). Defendant admits that position descriptions are not always reviewed every two years, but if Defendant attempts to post a vacancy announcement for a position that has a position description that is over two years old, the position description will normally get reviewed before the vacancy announcement goes out. (Doc. No. 44-9, p.11-12). Furthermore, when creating a trainee position, it is not unusual for the position to which the training position relates to be reviewed at that time. (Doc. No. 44-9, p.13-15).

In May of 2009, Ferekides submitted Plaintiff's position description to HR for review and recommended that the position remain a GS-8 grade level. Defendant sent the position description to Mr. Knutson, a classifier up north that was contracted to evaluate position descriptions. Knutson reviewed the position description and recommended a GS-7 grade. Thereafter, Defendant's classifier, Adam Garcia, reviewed Knutson's recommendation and signed off on the downgrade. Neither Ferekides nor Stipp was involved in the decision to downgrade Plaintiff's position.

Plaintiff responds that because there had been no change in his duties, a downgrade was not warranted. However, given that Knutson was the classifier that initially recommended the downgrade, and given that Plaintiff has offered no evidence that Knutson was aware of Plaintiff's disability or EEO activity, Plaintiff cannot establish a prima facie case of

28

discrimination or retaliation.

Garcia signed off on Knutson's recommendation to downgrade Plaintiff's position. Plaintiff contends that Garcia's involvement in Plaintiff's downgrade decision shows that the downgrade decision was discriminatory and/or retaliatory because of Garcia's involvement in another downgrade.  Specifically, Plaintiff points out that in 2009, another employee, Danny Campbell, filed an EEO charge of discrimination and thereafter was downgraded from a GS-6 to a GS-5.  Plaintiff contends that Neal Hamilton and Adam Garcia from HR were both involved in both Plaintiff and Campbell's downgrade decisions.

Plaintiff's allegations regarding Campbell's downgrade, however, are not enough to show that Plaintiff's downgrade was motivated by discrimination or retaliation. Campbell settled his claims against the VA, which is not evidence that Defendant downgraded Campbell's position for discriminatory or retaliatory reasons.

Finally, Plaintiff takes issue with Defendant's reason for reviewing his position description.  Defendant contends that position descriptions are supposed to be reviewed every two years.  Plaintiff, however, points to evidence that very few position descriptions are reviewed that often.  In fact, Plaintiff points out that of the more than 2,000 positions at the VA, HR received only 131 position descriptions for review in 2009 and 2010.  (Doc. No. 44-9, p. 19).

Defendant acknowledges that position descriptions are not always reviewed every two years, but if Defendant attempts to post a vacancy announcement for a position that has a position description that is over two years old, the position description will normally get reviewed before the vacancy announcement goes out.  (Doc. No. 44-9, p.11-12).  Furthermore, when creating a trainee position, it is not unusual for the position to which the training position

relates to be reviewed at that time.  (Doc. No. 44-9, p.13-15).

Thus, while Plaintiff tries to cast suspicion on Defendant's motivations for reviewing his position description, Plaintiff does not dispute that Defendant was posting a vacancy announcement for a fire inspector trainee position.  As such, Defendant has proffered a legitimate, non-discriminatory reason for reviewing Plaintiff's position description in 2009 in connection with the posting of a position for a fire inspector trainee.

Accordingly, the Court concludes that Plaintiff cannot establish a prima facie case of discrimination or retaliation with respect to the downgrade.  Furthermore, Defendant has proffered a legitimate, non-discriminatory reason for reviewing Plaintiff's position description, and Plaintiff has not shown evidence of pretext.  As such, the Court grants Defendant's motion for summary judgment on Plaintiff's retaliation and discrimination claims to the extent those claims are based on the downgrade decision.

### 3.  Five Day Suspension in August of 2010

Plaintiff received a five day suspension in August of 2010, and he contends that he was suspended for discriminatory and retaliatory reasons.  Defendant moves for summary judgment on Plaintiff's discrimination and retaliation claims based on this adverse employment action, arguing that Defendant had a legitimate, non-discriminatory reason for the suspension.  Specifically, Defendant contends that Plaintiff was suspended for failing to inspect 20 fire extinguishers during the month of December 2009.

Plaintiff does not dispute that he failed to inspect 20 fire extinguishers; he emailed Ferekides at 3:35 p.m. on December 30, 2009 to let her know.  Instead, Plaintiff argues that he should not have been suspended for failing to inspect the fire extinguishers because he was out

of the office for most of December and did not have the ability to inspect all of the extinguishers while he was there.  Plaintiff further contends that other people were available that could (and did) inspect the 20 extinguishers that he was not able to inspect, and as such, Defendant's proffered reason for the suspension is mere pretext.

Like the March 2009 suspension, Plaintiff is merely quarreling with the wisdom behind the August 2010 suspension.  However, given that Plaintiff admits that he did not inspect 20 fire extinguishers in December and that his duties included inspecting fire extinguishers (Doc. No. 44-2, p. 28, 55), Defendant has proffered a legitimate, non-discriminatory reason for the August 2010 suspension.  Therefore, the Court concludes that Plaintiff has not shown evidence of pretext.  As such, the Court grants Defendant's motion for summary judgment on Plaintiff's retaliation and discrimination claims to the extent those claims are based on the August 2010 suspension.

### B.  Hostile Work Environment

Plaintiff also claims that he was subjected to a discriminatory and retaliatory hostile work environment.  Defendant moves for summary judgment on this claim, arguing that the alleged harassment was not sufficiently severe or pervasive to support his claim.  At the outset, the Court notes that it assumes, without deciding, that a hostile work environment claim is cognizable under the Rehabilitation Act.  See Wolfe v. Postmaster General, 488 Fed. Appx. 465, 469 (11th Cir. 2012).

In order to establish a discriminatory hostile work environment claim, Plaintiff must show: (1) that he has a disability; (2) that he has been subject to unwelcome harassment; (3) that the harassment was based on his disability; (4) that the harassment was sufficiently severe or

31

pervasive to alter the terms and conditions his employment; and (5) that Defendant is responsible for such environment under either a theory of vicarious or of direct liability.  See id. (citation omitted).  In order to establish a retaliatory hostile work environment claim, Plaintiff must show: (1) that he engaged in a statutorily protected activity, such as filing an EEO charge; (2) that he has been subject to unwelcome harassment; (3) that the harassment was based on his engaging in the protected activity; and (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions his employment.  See Gowski v. Peake, 682 F.3d 1299, 1311, 1312 (11th Cir. 2012).  Thus, to state a hostile work environment claim, Plaintiff must show that the workplace was permeated with retaliatory or discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment.  See id.

The parties did not do a good job explaining the various incidents that make up Plaintiff's hostile work environment claim.  Instead, the Court searched through the record to get an understanding of the context for Plaintiff's vague and conclusory allegations regarding the conduct that supports his hostile work environment claim.  Given the lack of thorough analysis of this claim by the parties, the Court will defer ruling on this claim and hold oral argument on it before ruling.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (Doc. No. 44) is **GRANTED IN PART AND DEFERRED IN PART**:

(1)     The motion is **GRANTED** to the extent that the Court grants summary judgment on Plaintiff's discrimination and retaliation claims (Counts I and II).

(2)      The Court **DEFERS RULING** on Defendant's motion to the extent that it relates

to Plaintiff's hostile work environment claim (Count III).

(3)      The Court will hear oral argument on Defendant's motion for summary judgment

as to Plaintiff's hostile work environment claim on April 26, 2013 at 10:00 a.m. in

Courtroom 17.  The Court has set aside 1 hour for this hearing.

**DONE AND ORDERED** at Tampa, Florida, this 18th day of April, 2013.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record