UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DONALD G. CARMAN,

        Plaintiff,

v.                                     Case No.  8:11-cv-639-T-24 MAP

ERIC K. SHINSEKI, Secretary,
Department of Veteran Affairs,

        Defendant.
_____/

**ORDER**

       This cause comes before the Court on Defendant's Motion for Summary Judgment (Doc.

No. 44) to the extent that it relates to Plaintiff's hostile work environment claim.  Plaintiff

opposes the motion.  (Doc. No. 54).  The Court heard oral argument on the hostile work

environment claim on April 26, 2013.  As explained below, the motion is granted in part and

denied in part as to the hostile work environment claim.

**I.  Standard of Review**

       Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The Court must draw all inferences from the evidence in the light most favorable to the

non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d

1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of

showing the Court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial.  See id. (citation omitted).  When a moving party has

discharged its burden, the non-moving party must then go beyond the pleadings, and by its own

affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background

Plaintiff Donald Carman is disabled, and his disability involves a lumbar spine condition

and cervical spine condition that limits his ability to sit, stand, and walk for long periods of time.

He asserts a hostile work environment claim against Defendant regarding his employment as a

fire inspector in the Safety Office at the James Haley VA Medical Center ("VA").  He became a

fire inspector at the VA in June of 2007.  He went out on leave in August of 2008 to have back

surgery, and he did not return until the end of December of 2008.  In 2010, he took leave to have

shoulder surgery.

Plaintiff's job included inspecting the VA's 900 - 1,000 fire extinguishers every month

and conducting fire drills.  (Doc. No. 54-2, ¶ 16; Doc. No. 44-2, p. 60).  Plaintiff's supervisor

was Debbie Ferekides, and she reported to Ronald Stipp until September of 2010.  In May of

2011, Jeff Karsonovich took over Stipp's position.

In his amended complaint, Plaintiff contends that he was subjected to a discriminatory

and retaliatory hostile work environment.  Plaintiff filed EEO charges regarding the hostile work

environment on March 28, 2011 and December 6, 2011.  (Doc. No. 46-1, p. 18, 44).  Within

those EEO charges, Plaintiff identifies various incidents, which the Court described in its April

18, 2013 summary judgment order.  (Doc. No. 56).  In that order, the Court deferred ruling on

Defendant's motion to the extent that it related to Plaintiff's hostile work environment claim and

scheduled oral argument on that portion of the motion.  After having the benefit of oral

argument, the Court grants in part and denies in part Defendant's motion for summary judgment

as to Plaintiff's hostile work environment claim, as explained below.

### III.  Conduct that Cannot Provide a Basis for Plaintiff's Hostile Work Environment Claim

The following conduct cannot provide a basis for Plaintiff's hostile work environment claim, because there is no evidence that such conduct: (1) constituted unwelcome harassment, and/or (2) was motivated by disability discrimination or retaliation for Plaintiff's EEO activity. Therefore, Defendant's motion for summary judgment is granted to the extent that the following incidents cannot support Plaintiff's hostile work environment claim.

#### A.  Performance Evaluation

Plaintiff contends that in February 2009, he received Ferekides' performance evaluation that she created without performing the required periodic progress review with him, and Ferekides back-dated her signature to 2008.  (Doc. No. 54-2, ¶ 15).  However, Plaintiff was rated as "fully successful" on this performance evaluation.  (Doc. No. 54-8).  Therefore, there is no basis for finding that this conduct constituted unwelcome harassment and/or was motivated by discriminatory or retaliatory animus.  As such, this conduct cannot support a hostile work environment claim.

#### B.  Unsafe Work Environment

Plaintiff contends that on November 20, 2009, Ferekides subjected him to an unsafe work environment by placing a 4x8 foot banner on the floor at the entrance of his office.  (Doc. No. 54-2, ¶ 26).  The banner was hung for fire prevention week, but it was not taken down in a timely manner.  (Doc. No. 54-19, p. 82).  As a result, someone removed the banner and brought it to Ferekides.  (Doc. No. 54-19, p. 82-83).  Ferekides put the banner along the wall in Plaintiff and Thomas Miller's office so they would see the banner and put it away.  (Doc. No. 54-19, p.

83).

Upon consideration, this Court concludes that there is no basis for finding that this conduct constituted unwelcome harassment.  Furthermore, even if it could be considered unwelcome harassment, there is no basis for finding this conduct was motivated by discriminatory or retaliatory animus, such that it could support a hostile work environment claim.

### C.  Allegations Against Plaintiff

Plaintiff contends that in February of 2010, Ferekides did not support him when he received two complaints regarding fire drill training with the OR staff.  (Doc. No. 54-2, ¶ 27).  Specifically, the chief of anesthesiology complained that the fire drill training did not meet his expectations and that Plaintiff was late.  (Doc. No. 44-4, p. 79).  Ferekides responded to the chief that she would look into his complaints.  (Doc. No. 44-4, p. 79).  While Ferekides did not specifically respond to the chief to support Plaintiff, Ferekides instead spoke with others about the matter and resolved the issue.  (Doc. No. 44-4, p. 80-82).

There is no evidence that Plaintiff was disciplined as a result of the complaints or that this incident affected Plaintiff's employment is any way.  Thus, there is no basis for finding that this conduct constituted unwelcome harassment.  Furthermore, even if it could be considered unwelcome harassment, there is no basis for finding this conduct was motivated by discriminatory or retaliatory animus, such that it could support a hostile work environment claim.

Additionally, Plaintiff contends that in October of 2010, Ferekides requested a fact-finding meeting with him regarding his alleged failure to inspect the microwaves in the VA,

which Ferekides ultimately concluded was the result of a mis-communication.  (Doc. No. 44-4, p. 97-98).  Again, there is no evidence that Plaintiff was disciplined as a result this or that this incident affected Plaintiff's employment is any way.  Thus, there is no basis for finding that this conduct constituted unwelcome harassment.  Furthermore, even if it could be considered unwelcome harassment, there is no basis for finding this conduct was motivated by discriminatory or retaliatory animus, such that it could support a hostile work environment claim.

Finally, on January 25, 2011, Ferekides told Plaintiff that there had been some oversights in assignments not completed and that he needed to repeat the survey inspection of the SCI garage by March 2011.  (Doc. No. 54-2, ¶ 29).  However, Ferekides determined that there had been a mis-communication regarding who was responsible for the inspection of the SCI garage, and ultimately, Plaintiff did not have to redo the inspection.  (Doc. No. 44-4, p. 108-10).  Again, there is no evidence that Plaintiff was disciplined as a result this or that this incident affected Plaintiff's employment is any way.  Thus, there is no basis for finding that this conduct constituted unwelcome harassment.  Furthermore, even if it could be considered unwelcome harassment, there is no basis for finding this conduct was motivated by discriminatory or retaliatory animus, such that it could support a hostile work environment claim.

### D.  Documentation in the Fire System Impairment Log

Plaintiff contends that on September 1, 2010, and contrary to past practice, Ferekides instructed him to stop documenting the Fire System Impairment Log in the network drive.  (Doc. No. 54-2, ¶ 29).  However, there is no evidence that this affected Plaintiff's employment is any way.  Thus, there is no basis for finding that this conduct constituted unwelcome harassment.

5

Furthermore, even if it could be considered unwelcome harassment, there is no basis for finding this conduct was motivated by discriminatory or retaliatory animus, such that it could support a hostile work environment claim.

### E.  Drug Test

Plaintiff contends that on January 19, 2011, he was singled out and subjected to a purportedly "random" drug test.  (Doc. No. 54-2).  However, the evidence before the Court shows that someone in Washington determines who is randomly drug tested, and as such, it cannot be attributed to someone at the VA in Tampa.  (Doc. No. 44-4, p. 106-08).  Therefore, this incident cannot support a hostile work environment claim.

### F.  Denial of Ability to Obtain Overtime for Evening Fire Drills

Prior to Miller, the fire inspector trainee, being hired, Plaintiff conducted all of the fire drills.  (Doc. No. 44-1, p. 57, 63).  After Miller was hired, Plaintiff did the morning fire drills, and Miller was supposed to do the evening fire drills.  (Doc. No. 44-1, p. 57).  Plaintiff was able to get an hour of overtime for doing the 6:00 a.m. fire drills, since his workday started at 7:00 a.m and ended at 3:30 p.m.  (Doc. No. 44-1, p. 60).  Miller, whose workday went from 8:30 a.m. to 5:00 p.m. was given the evening fire drills.  (Doc. No. 44-1, p. 57, 60).  Plaintiff wanted the ability to do the 5:00 p.m. fire drills, because those would generate two overtime hours for him, given that his workday ended at 3:30.  (Doc. No. 44-1, p. 57-58, 60).  Ferekides denied Plaintiff's request to do the evening fire drills, because Miller could do the evening fire drills during his shift and would not require overtime.  (Doc. No. 44-1, p. 60-61, 64).

There is no basis for finding that Ferekides' decision to deny Plaintiff the opportunity to conduct evening fire drills constituted unwelcome harassment or that it was motivated by

discriminatory or retaliatory animus, such that it could support a hostile work environment claim. Instead, Miller was given the evening fire drills, because he could do them during his shift and would not require overtime.

## IV.  Conduct that Remains for Trial as to Plaintiff's Hostile Work Environment Claim

A genuine issue of material fact exists regarding the whether the following conduct created a hostile work environment.  Therefore, the Court denies summary judgment as to Plaintiff's hostile work environment claim to the extent that it is based on the following conduct.

### A.  Reasonable Accommodations

Plaintiff contends that he requested two reasonable accommodations: (1) a compressed 5-4-9 work schedule (in 2007), and (2) a golf cart to use when checking fire extinguishers (in 2010).  Plaintiff contends that Ferekides denied both requests.

### B.  Denial of Training

In mid-2008, an asbestos training course was announced.  Plaintiff asked James Watson (who was coordinating the asbestos training course) whether he was able to take the training course.  (Doc. No. 54-1, p. 20-21).  Watson responded that he was told that if Plaintiff was having back surgery, then Plaintiff could not take the asbestos training course, but if Plaintiff did not have back surgery, then Plaintiff could take the asbestos training course.  (Doc. No. 54-1, p. 20-21).  Plaintiff ended up having back surgery on August 18, 2008, and he did not take the asbestos training course.

In January of 2009, Plaintiff received an email regarding an intermediate safety training course in Nevada in February of 2009.  (Doc. No. 54-1, p. 19-20, 22).  Ferekides denied Plaintiff's request to attend the intermediate safety training course.    (Doc. No. 54-1, p. 22).  On

7

January 16, 2009, Plaintiff filed an EEO charge of discrimination relating to the denial of his request to attend the intermediate safety training.  (Doc. No. 44-8, p.2).

After Ferekides' denial, Plaintiff went to Stipp to ask for permission to attend the intermediate safety training course, and Stipp told Plaintiff that Plaintiff needed Ferekides' permission in order to attend.  (Doc. No. 54-1, p. 62).  Plaintiff called Ferekides, and she responded that Plaintiff could not take no for an answer, that she knew that he had filed a discrimination charge against her, and that the final answer on his training request was no.  (Doc. No. 54-1, p. 62-65).

Additionally, Plaintiff alleges that since September 29, 2009, Ferekides has denied all of his training requests.  (Doc. No. 16, ¶ 15).  In his EEO charge, Plaintiff identifies several trainings requests that were denied or ignored: (1) on October 8, 2009, he was denied OSHA training; (2) on October 7, 2010, he was denied VA EES VISN training; (3) on February 10, 2010, his request for VA Basic GEMS training was ignored; (4) on September 29, 2009, October 7, 2009, and December 9, 2010, his request for OSHA training was ignored; (5) on December 29, 2010, his request for OSHA training was ignored; (6) on January 5, 2011 and January 11, 2011, his requests for OSHA training were denied; and (7) on February 22, 2011, his request to attend an NFPA training was ignored.  (Doc. No. 46-1, 9. 20-21).

### C.  Conversations About Plaintiff

Plaintiff submits the EEOC statement of Barbara Sittnick, Plaintiff's co-worker in the Safety Office, in which Sittnick states that she had overheard discussions in the Safety Office between Ferekides and Sittnick's other co-workers that Plaintiff had filed an EEO complaint, and Ferekides told Sittnick to be careful.  (Doc. No. 44-11, p. 4, 6).  Sittnick also states that she

overheard conversations in the Safety Office about having to cover for Plaintiff while he was out and questioning whether Plaintiff would come back to work after his back surgery. (Doc. No. 44-11, p. 5). Based on the negative conversations that she overheard, Sittnick concluded that the Safety Office staff did not like Plaintiff. (Doc. No. 44-11, p. 5). As a result, on March 13, 2009, Sittnick spoke with Ferekides and told her that she did not want to be included in the negative conversations about Plaintiff. (Doc. No. 44-11).

Additionally, on May 28, 2009, Plaintiff observed Ferekides and other co-workers laughing and making fun of him when he requested additional training. (Doc. No. 54-2, ¶25). Plaintiff believes that Ferekides routinely defamed Plaintiff whenever the opportunity arose. (Doc. No. 54-2, ¶ 34).

### D.  May 16, 2008 Report of Contact

Plaintiff contends that Ferekides fabricated a written report of contact dated May 16, 2008 regarding an alleged verbal counseling about the required number of fire drills that had to be performed. (Doc. No. 54-2, ¶ 15; Doc. No. 46-1, p.54). Ferekides stated in the Report of Contact that she gave Plaintiff a copy of his position description and told him that if he had any questions about it, to ask her by May 19, 2008. (Doc. No. 46-1, p.54). The Report of Contact ended with the statement that Plaintiff "did not discuss this matter with me since May 16th." (Doc. No. 46-1, p.54). However, because the Report of Contact was dated May 16th, and Ferekides stated therein that she had not discussed the matter of his position description with him since May 16th, Plaintiff contends that Ferekides fabricated the document, or at least back-dated it. Furthermore, Plaintiff contends that he never received the alleged verbal counseling on May 16, 2008. (Doc. No. 54-2, ¶ 13, 15).

**E.  Ferekides' Treatment of Plaintiff after He Returned from Surgery**

Plaintiff contends that in January 2009, after he returned from back surgery, Ferekides removed him from several group activities and cancelled his membership in other hospital committees.  (Doc. No. 54-2, ¶ 15).   Additionally, Plaintiff contends that from January 2009 through June 2010, Ferekides spent no time with him updating him on any changes adopted during his extended sick leave absence.  (Doc. No. 54-2, ¶ 15).

**F.  Allegations Against Plaintiff**

Plaintiff contends that in October of 2010, Ferekides requested a fact-finding meeting with him regarding his taking sick leave for his back surgery and allegedly not filling out the proper paperwork in order to take the leave.  (Doc. No. 44-4, p. 92-96).

**G.  Denial of Requests to Take Care of Personal Matters on Work Time**

Plaintiff contends that on August 20, 2010, Ferekides denied his request for authorized time to go to the Union to discuss the suspension he received.  Additionally, Plaintiff contends that on December 10, 2010, Ferekides would not allow him to take 30 minutes during working hours to finish his physical therapy session, despite the fact that she had allowed two other employees to do yoga and walking during business hours.  (Doc. No. 54-2, ¶ 29).

**H.  Leave Requests**

Plaintiff contends that Ferekides has stopped approving leave in advance and instead approves it or disapproves it within three days of the requested leave date.  (Doc. No. 54-2, ¶ 29).  Furthermore, Plaintiff contends that from April of  2010 to August 2010, Ferekides frequently questioned and harassed him regarding his attempts to enter leave requests.

**I.  March 30, 2011 Incident**

On March 30, 2011, Ferekides asked Plaintiff to come into her office to discuss a work issue.  (Doc. No. 54-2, ¶ 30).  Plaintiff was entitled to have a union representative present whenever a written or verbal counseling about work was discussed, so Plaintiff asked that a union representative be present.  (Doc. No. 54-2, ¶ 30).  Ferekides denied Plaintiff's request that a union representative be present and began reprimanding Plaintiff.  (Doc. No. 54-2, ¶ 30).  Plaintiff told Ferekides that he would leave her office if he could not have a union representative present, and Ferekides again denied his request.  (Doc. No. 54-2, ¶ 30).  Plaintiff began to leave Ferekides' office, and she physically blocked Plaintiff's exit and raised her voice.  (Doc. No. 54-2, ¶ 30).

In response, Plaintiff went over to the phone on Ferekides' desk and called the VA police.  (Doc. No. 54-2, ¶ 30).  Ferekides repeatedly told Plaintiff to hang up the phone, but he did not hang up.  (Doc. No. 54-2, ¶ 30).  Ferekides then pressed the panic button in her office.  (Doc. No. 44-3, p. 25).  Thereafter, another employee walked into Ferekides' office, and Plaintiff was able to exit Ferekides' office.  (Doc. No. 44-2, p, 93).  When the VA police arrived, Plaintiff spoke with an officer and broke down crying about the incident.  (Doc. No. 44-2, p. 93; Doc. No. 54-14).  Thereafter, Plaintiff filed a workers' compensation claim due to the effect this incident has had on him (i.e., it has caused depression and anxiety).  (Doc. No. 54-17).

**J.  Leave Status and Letters After the March 30, 2011 Incident**

Defendant opposed Plaintiff's workers' compensation claim, but on June 8, 2012, the Office of Workers' Comp Programs ("OWCP") approved his claim.  (Doc. No. 54-17; Doc. No. 54-2, ¶ 32).  Plaintiff has not returned to work since the March 30, 2011 incident.  (Doc. No. 54-

2, ¶ 33).

Plaintiff was not paid for a 15-month period after the March 30th incident until OWCP approved his workers' compensation claim.  (Doc. No. 54-2, ¶ 33).  Furthermore, Defendant has still not paid Plaintiff for the first 45 days after the incident when he was out on workers' compensation leave ("OWCP leave").  (Doc. No. 54-2, ¶ 33).  Additionally, Plaintiff believes that Jeff Karsonovich (who had taken over Stipp's position) incorrectly charged Plaintiff's annual leave, sick leave, and FMLA leave while Plaintiff has been out on OWCP leave.  (Doc. No. 54-2, ¶ 33).

On May 14, 2011, Plaintiff learned that Defendant did not send OWCP the supporting documentation he had attached to his workers' compensation claim.  (Doc. No. 54-2, ¶ 34). Furthermore, Plaintiff contends that Karsonovich sent Plaintiff several improper letters in which he threatened to characterize Plaintiff as AWOL (which could lead to termination).  (Doc. No. 54-2, ¶ 35-37; Doc. No. 46-3, p. 48-50, 62-63, 65). Plaintiff contends that Karsonovich's letters were improper, because Section 10 of the Master Agreement between the VA and the American Federation of Government Employees states that "LWOP is granted at the discretion of the Department, except . . . [w]hen requested by an employee who has suffered an incapacitating job-related injury or illness and is waiting adjudication of a claim for employee compensation by the OWCP."  (Doc. No. 54-25, p. 10).  Thus, Plaintiff contends that requiring Plaintiff to submit his medical records to HR, threatening to characterize him as AWOL, and threatening possible termination was improper, because he was entitled to have LWOP status while his workers' compensation claim was awaiting adjudication.

**V.  Conclusion**

      Accordingly, as explained above, it is ORDERED AND ADJUDGED that Defendant's

Motion for Summary Judgment (Doc. No. 44) is **GRANTED IN PART AND DENIED IN**

**PART** as to Plaintiff's hostile work environment claim (Count III).  The parties' joint pretrial

statement must be filed by May 3, 2013.

      **DONE AND ORDERED** at Tampa, Florida, this 30th day of April, 2013.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record